**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3481

*Counsel for Plaintiff Michigan Laborers' Pension Fund*

[Additional counsel on signature page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MICHIGAN LABORERS' PENSION FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>DOXIMITY, INC., JEFFREY TANGNEY, ANNA BRYSON, NATE GROSS, and PERRY GOLD,<br><br>Defendants. | Case No. 3:26-cv-10529<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>CLASS ACTION</u><br><br>DEMAND FOR JURY TRIAL |

Plaintiff, the Michigan Laborers' Pension Fund ("Plaintiff"), by and through its counsel, alleges the following based upon personal knowledge, and upon information and belief as to all other matters, including the investigation of Plaintiff's counsel, which included, among other things, a review of Defendants' (defined below) United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by Doximity, Inc. ("Doximity" or the "Company"), analyst reports and advisories about the Company, media reports concerning the Company, judicial filings and opinions, and other publicly available information. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION AND OVERVIEW

1. This is a federal securities class action on behalf of all persons and entities that purchased or otherwise acquired Doximity common stock between August 8, 2024, and May 13, 2026, inclusive (the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder.

2. Doximity is a digital platform for medical professionals that combines health care news, workflow products, and clinician networking. Doximity is frequently referred to as the "LinkedIn for doctors." Its platform is, with a few exceptions, free to use for its medical professional members.

3. The Company generates most of its revenue by selling marketing subscriptions to its customers that advertise on Doximity's platform, including pharmaceutical companies and hospitals. According to the Company, the vast majority of those ads are placed on Doximity's social-media-like "Newsfeed" platform.

4. Doximity distinguishes itself from its competitors by describing itself as a "deep engagement" platform. A "deep engagement" is a "click" on an ad or sponsored content to reach the full version of the content, which reflects intent to actually view the entire ad or sponsored content. Doximity marketed its Newsfeed as providing "click" based engagement.

5. In contrast, many of Doximity's competitors are "light engagement" platforms, meaning that they focus on passive advertisements, such as banner ads that appear at the bottom or side of a page and can be easily ignored, ads that conceal portions of the page's content until the user manually finds and clicks the "X" to dismiss them, and cost-efficient email blasts.

6. Throughout the Class Period, Doximity claimed that the Company's Newsfeed was its "biggest revenue driver." Specifically, Defendants claimed that the Company's growth was "led by our Newsfeed, which is both our most used and most monetized product" and told investors that the Newsfeed was consistently "reach[ing] new highs," with "an all-time record of quarterly active prescribers and double-digit growth in the number of articles read or tapped." In addition, Doximity touted its "deep engagement," assuring investors that Doximity does not "bombard physicians with ads and messages in hopes of getting lucky" and assured investors that "[Doximity does not] have an e-newsletter product."

7. In truth, Doximity overstated the impact that its Newsfeed had on its revenue growth, and the Company was losing market share to its competitors with more favorable pricing and engagement models. Additionally, notwithstanding its frequent statements to the contrary, Doximity relied heavily on both banner ads and email newsletters as advertising methods.

8. The truth began to emerge on November 6, 2025, when, despite reporting strong second quarter results, Doximity expressed a degree of caution regarding the outlook for ad spending and implied a slowdown in sales growth in the second half of the 2026 fiscal year, which ended on March 31, 2026. As a result of these disclosures, the price of Doximity common stock declined by $8.29 per share, or 13%.

9. Then, on February 5, 2026, Doximity lowered its revenue guidance for 2026 full fiscal year, which ended on March 31, 2026, and announced that its sales growth had decelerated while its net income had contracted, which will negatively impact its 2026 fiscal fourth quarter. Following these poor financial results, analysts noted that "uncertainty is lingering. This is not widespread, meaning not all pharma[ceutical] clients are holding back" on their advertising spend. Analysts also began to posit that the reason for Doximity's slowing growth was that the Company

was actually losing market share to its competitors. Specifically, an analyst at Evercore noted that older companies, such as Doximity, "are losing share while programmatic, social, and other new formats are gaining share." As a result of these disclosures, the price of Doximity common stock declined by $5.59 per share, or 17%.

10. On May 13, 2026, Doximity announced that it missed its already-reduced revenue guidance and projected a significantly slower pace of growth for its 2027 fiscal year, which ends on March 31, 2027. As a result, several analysts downgraded Doximity stock citing issues specific to the Company's business. For example, Freeman Capital Markets described the news as "a tough pill to swallow" as shares fell to "an all-time low" and Jefferies placed the stock in the "penalty box." Leerink Partners also put Doximity "in the penalty box" following the "eye-catching" guidance paired with the "shock value" of "[a]ll of the dynamics that lead to the guidance, including market softness, timing of commitments and the spend to ramp its AI products." RBC Capital Markets noted that Doximity's stalled net revenue retention suggested an "increasingly competitive market." As a result of these disclosures, the price of Doximity common stock declined by $5.38 per share, or 23%.

11. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock pursuant to the revelation of the fraud, Plaintiff and other Class members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

12. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

13. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

14. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because Doximity's principal executive office is located in San Francisco, California, which is situated in this District, and many of the acts giving rise to the

violations complained of in this action, including the preparation and dissemination of materially false and misleading statements, occurred in substantial part in this District.

15. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

16. This is a federal securities class action. Accordingly, under Civil Local Rule 3-2(c) and General Order No. 44(D)(3), this action should be assigned using a district-wide system.

## III. PARTIES

### A. Plaintiff

17. Plaintiff Michigan Laborers' Pension Fund is a pension fund established to provide medical, pension, annuity, and other benefits for eligible members and their dependents. As indicated in the accompanying certification, Plaintiff purchased Doximity common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

### B. Defendants

18. Defendant Doximity is a Delaware corporation, with its principal executive offices at 500 3rd St., Suite 510, San Francisco, California. The Company's shares trade on NYSE under the ticker symbol "DOCS." As of May 12, 2026, Doximity had nearly 132 million shares outstanding, owned by hundreds or thousands of investors.

19. Defendant Jeffrey Tangney ("Tangney") is, and was at all relevant times, the Company's co-founder and Chief Executive Officer, and chairs the Company's Board of Directors.

20. Defendant Anna Bryson ("Bryson") was, from May 11, 2021, to April 13, 2026, the Company's Chief Financial Officer.

21. Defendant Nate Gross ("Gross") was, from 2010 until June 13, 2025, Doximity's co-founder and Chief Strategy Officer.

22. Defendant Perry Gold ("Gold") is, and was at all relevant times, the Company's Vice President of Investor Relations & Revenue Operations.

23. Defendants Tangney, Bryson, Gross, and Gold are collectively referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Doximity's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. Each Individual Defendant was provided with copies of the Company's reports alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and/or were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading.

24. Doximity and the Individual Defendants are collectively referred to herein as "Defendants."

## IV. SUBSTANTIVE ALLEGATIONS

### A. Background

25. Doximity is an online platform marketed exclusively to U.S. medical professionals and is often referred to as "LinkedIn for doctors." Doximity's digital platform combines health care news, workflow products, and clinician networking which allows its members to "connect" with each other and search for job opportunities. According to Doximity, most of the digital advertisements appear on its social-media-style platform called the Newsfeed. The Newsfeed is a personalized stream of medical news, research, clinical updates, and advertisements tailored to physicians' and other health care professionals' specific areas of expertise.

26. Like other social media companies, Doximity is mostly free to join and use for its members. Instead of charging members, Doximity generates nearly all its revenue through its Marketing Solutions segment, which sells digital advertising space to pharmaceutical companies

and other similar customers. According to the Company, the vast majority of those ads are placed on Doximity's Newsfeed.

27. Doximity markets itself as a "deep engagement" platform. A "deep engagement" is a "click" by a user on an ad or sponsored content to reach full-length written content which, in theory, reflects the user's intent to actually view the ad or sponsored content and, in turn, the likely impact of the ad or sponsored content.

28. In contrast, many of Doximity's competitors operate as "light engagement" platforms, focusing on passive advertising or sponsored content. This includes banner ads—typically placed at the bottom or along the side of a page that can be easily ignored or as overlay ads that obscure content until the user manually closes them, and cost-efficient email blast campaigns.

29. While other advertising-based companies typically charge customers based on the number of engagements with customers' ads or sponsored content, or number of times the ads or sponsored content makes an "impression" or appears on users' screens, Doximity utilizes a proprietary "cost-per-target" pricing structure. Customers pay for subscriptions to specific "modules," which allow them to target a set number of Doximity members per month for the duration of the subscription period. Customers may also pay to target their advertisements to specific audience members based on attributes such as specialty, credentials, and location.

**B. Defendants' False And Misleading Statements**

30. The Class Period begins on August 8, 2024, when Doximity filed with the SEC on Form 8-K its first quarter financial results for the 2025 fiscal year, which ended on March 31, 2025. The Form 8-K quotes Defendant Tangney, stating, "[w]e were pleased to deliver strong profits and record engagement last quarter, as we beat on both our top and bottom lines."

31. That same day, Doximity held a conference call with analysts and investors to discuss its quarterly financial results for the first quarter of fiscal year ending on March 31, 2025. During that call, Defendant Tangney attributed growth in both quarterly revenue and adjusted EBITDA to record-breaking deep engagement with ads and sponsored material on Doximity's

Newsfeed, noting that the Newsfeed "set new records," with "article reads among prescribers reach[ing] an all-time high."

32. On that same call, Defendant Tangney also stated that "with record engagement across our platform . . . we're even more confident in our competitive position and our ability to gain market share." Then, in response to a question from analysts regarding thoughts on Doximity's competition, Defendant Tangney responded that "we're gaining share, again, against our competition."

33. On November 7, 2024, Doximity held a conference call with analysts and investors to discuss its financial results for the second quarter of 2025 fiscal year, which ended on March 31, 2025. During that call, Defendant Tangney attributed Doximity's quarterly revenue growth to engagement on the Newsfeed, calling Newsfeed Doximity's "biggest revenue driver," and noting Newsfeed once again "hit an all-time record high of articles tapped or articles read." Defendant Tangney also stated that "Q2 was another record engagement quarter for us."

34. On that same call, in response to an analyst who asked, "how do you feel about kind of external factors of competition?" Defendant Gross answered, "We feel good about our ability to gain share and our competitive positioning . . . our ability to have really high-quality product, reach, authentic engagement and doctor centricity to these commercial programs remains key."

35. On February 6, 2025, Doximity filed with the SEC on Form 8-K its third quarter financial results for the 2025 fiscal year, which ended on March 31, 2025. The Form 8-K quotes Defendant Tangney stating, "[w]e're proud to deliver another quarter of record engagement in Q3."

36. That same day, Doximity held a conference call with analysts and investors to discuss the Company's financial results for the third quarter of 2025 fiscal year, which ended on March 31, 2025. On that call, Defendant Tangney stated, "our network engagement has never been stronger." Further, Defendant Tangney attributed this growth to engagement on its Newsfeed, stating that "Newsfeed users continued to lead the way," and that "[f]or the first time

ever, in Q3, more than 1 million unique active prescribers scrolled our feed to stay current on the latest news in their fields."

37. On May 15, 2025, Doximity filed with the SEC on Form 8-K its fourth quarter and fiscal year 2025 financial results for the 2025 fiscal year, which ended on March 31, 2025. The Form 8-K quotes Defendant Tangney, stating, "[w]e closed out fiscal 2025 on a high note, with record engagement."

38. That same day, Doximity held a conference call with analysts and investors to discuss the Company's financial results for the fourth quarter and full year of its 2025 fiscal year, which ended on March 31, 2025. During that call, Defendant Tangney attributed the Company's strong performance and quarterly revenue growth to its Newsfeed, noting that it was its "most used and most monetized product" and that its "unique newsfeed users hit record highs," and "articles read or tapped were up more than 30% year-on-year."

39. On that same call, Defendant Tangney denied that Doximity had any form of e-newsletter or email campaign. Specifically, in response to an analyst's question about engagement through the Company's e-newsletter, Defendant Tangney replied strongly "we don't have an e-newsletter product, so just so I'm clear on that front. We do have a Newsfeed product."

40. On August 7, 2025, Doximity filed with the SEC on Form 8-K its first quarter financial results for the 2026 fiscal year, which ended on March 31, 2026. The Form 8-K quotes Defendant Tangney, stating, "[w]e began our year with strong profit growth and record engagement across our newsfeed, workflow, and AI products."

41. That same day, Doximity held a conference call with analysts and investors to discuss the Company's financial results for the first quarter of its 2026 fiscal year, which ended on March 31, 2026. During that call, Defendant Tangney attributed Doximity's revenue growth to engagement on its Newsfeed, stating, "[o]ur newsfeed also hit record highs, with over 1 million quarterly active prescribers and double-digit percent growth in articles read or tapped."

42. Throughout the entire Class Period, Doximity's "media kit" has been publicly accessible and linked on Doximity's website within its Hospital Solutions "Solution Finder" page.

The media kit states, "you won't find any banner ads on Doximity. We don't bombard physicians with ads and messages in hopes of getting lucky. We create content experiences that physicians value and actively seek. We leverage data to target them precisely, ensuring that every engagement is meaningful and creates impact."

43. Throughout the entire Class Period, Doximity's website's "About Us" page stated, and still states, "Doximity doesn't bombard physicians with ads and messages in hopes of getting lucky. We create content experiences that physicians value and actively seek. We leverage data to target them precisely, ensuring that every engagement is meaningful and creates impact."

44. The statements set forth above in ¶¶ 30-43 were materially false and misleading and failed to disclose material facts necessary to make the statements made, in light of the circumstances in which they were made, not false and misleading. In truth, Doximity overstated the impact that its Newsfeed would have on its revenue growth, and the Company was losing market share to its competitors with more favorable pricing and engagement models, while also using banner ads and e-newsletters instead of deep engagement tactics.

### C. The Truth Emerges

45. The truth began to emerge on November 6, 2025, when Doximity expressed a degree of caution regarding the outlook for ad spending and implied a slowdown in sales growth in the second half of the 2026 fiscal year, which ended on March 31, 2026. As a result of these disclosures, the price of Doximity common stock declined by $8.29 per share, or 13%.

46. Despite these disclosures, that same day, Doximity held an earnings call with analysts and investors to discuss the Company's financial results for the second quarter of its 2026 fiscal year, which ended on March 31, 2026. Defendant Tangney continued to attribute Doximity's strong performance to engagement on its Newsfeed, stating that Newsfeed "led the way with an all-time record number of quarterly active prescribers and double-digit growth in the number of articles read or tapped."

47. The statement set forth above in ¶ 46 was materially false and misleading and failed to disclose material facts necessary to make the statements made, in light of the circumstances in

which it was made, not false and misleading. In truth, Doximity overstated the impact that its Newsfeed would have on its revenue growth, and the Company was losing market share to its competitors with more favorable pricing and engagement models, while also utilizing light engagement tactics, including banner ads and e-newsletters.

48. Then, on February 5, 2026, Doximity lowered its revenue guidance for 2026 fiscal year, which ended on March 31, 2026, and announced that its sales growth had decelerated while its net income had contracted, which will negatively impact its fiscal fourth quarter.

49. Following these disclosures, analysts noted that despite Doximity's assurances, "uncertainty is lingering. This is not widespread, meaning not all pharma[ceutical] clients are holding back" on their advertising spend. Analysts also began to consider that the true reason for Doximity's slowing growth was that the Company was losing market share to its competitors. An analyst at Evercore noted that older companies, such as Doximity, "are losing share while programmatic, social, and other new formats are gaining share." As a result of these disclosures, the price of Doximity common stock declined by $5.59 per share, or 17%.

50. However, that same day, Doximity held an earnings call with analysts and investors to discuss the Company's financial results for the third quarter of its 2026 fiscal year, which ended on March 31, 2026. Defendant Gold blamed this slowdown on customer buying patterns, explaining that the Company "heard from multiple customers, they deployed a lower percentage of their budget upfront." Defendant Gold described the change in customers' budgetary decisions as "an anomaly for this year" and that was "not something that we expect to continue."

51. That same day, Doximity also filed with the SEC on Form 8-K its third quarter financial results for the 2026 fiscal year, which ended on March 31, 2026. The Form 8-K quotes Defendant Tangney, stating, "[w]e're proud to deliver another quarter of . . . record engagement."

52. The statements set forth above in ¶¶ 50-51 were materially false and misleading and failed to disclose material facts necessary to make the statements made, in light of the circumstances in which they were made, not false and misleading. In truth, Doximity overstated the impact that its Newsfeed would have on its revenue growth, and the Company was losing

market share to its competitors with more favorable pricing and engagement models, while mimicking engagement via banner ads and e-newsletters.

53. On May 13, 2026, Doximity announced that it missed its already-reduced revenue guidance and projected a significantly slower pace of growth for its 2027 fiscal year, which ends on March 31, 2027. Several analysts reacted to this news and downgraded Doximity stock. Freeman Capital Markets described the news as "a tough pill to swallow" as shares fell to "an all-time low" and Jefferies placed the stock in the "penalty box." Leerink Partners also put Doximity "in the penalty box" following the "eye-catching" guidance, while RBC Capital Markets noted that Doximity's stalled net revenue retention suggested an "increasingly competitive market." As a result of these disclosures, the price of Doximity common stock declined an additional $5.38 per share, or 23%, from a closing price of $23.39 on May 13, 2026, to a closing price of $18.01 on May 14, 2026.

## V. CLASS ACTION ALLEGATIONS

54. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities that purchased or otherwise acquired Doximity common stock during the Class Period (collectively, the "Class"). Excluded from the Class are Defendants and their families, directors, and officers of Doximity and their families and affiliates.

55. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of May 12, 2026, Doximity had nearly 132 million shares outstanding, owned by hundreds or thousands of investors.

56. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) Whether Defendants violated the Exchange Act;

(b) Whether Defendants omitted and/or misrepresented material facts;

(c) Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) Whether the Individual Defendants are personally liable for the alleged misrepresentations and omissions described herein;

(e) Whether the Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(f) Whether Defendants' conduct impacted the price of Doximity common stock;

(g) Whether Defendants' conduct caused the members of the Class to sustain damages; and

(h) The extent of damage sustained by Class members and the appropriate measure of damages.

57. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

58. Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

59. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all Class members is impracticable.

## VI. INAPPLICABILITY OF STATUTORY SAFE HARBOR

60. Doximity's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

61. The Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Doximity who knew that the statement was false. None of the historic or

present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## VII. PRESUMPTION OF RELIANCE

62. At all relevant times, the market for Doximity common stock was an efficient market for the following reasons, among others:

(a) Doximity common stock met the requirements for listing, and was listed and actively traded on NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Doximity filed periodic public reports with the SEC and NYSE;

(c) Doximity regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Doximity was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

63. As a result of the foregoing, the market for Doximity common stock promptly digested current information regarding Doximity from all publicly available sources and reflected such information in the price of Doximity common stock. Under these circumstances, all purchasers of Doximity common stock during the Class Period suffered similar injury through

their purchase of Doximity common stock at artificially inflated prices and the presumption of reliance applies.

64. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Doximity's business operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.

## VIII. LOSS CAUSATION

65. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

66. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. This artificially inflated the price of Doximity common stock and operated as a fraud or deceit on the Class. Later, when the alleged misrepresentations and fraudulent conduct were disclosed to the market on November 6, 2025, February 5, 2026, and May 13, 2026, the price of Doximity common stock fell precipitously as the prior artificial inflation came out of the price over time. As a result of their purchases of Doximity common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.,* damages, under the federal securities laws.

## IX. SCIENTER ALLEGATIONS

67. As alleged herein, the Defendants acted with scienter since the Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the

federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Doximity, their control over, and/or receipt and/or modification of Doximity's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Doximity, participated in the fraudulent scheme alleged herein.

68. Numerous facts, including those detailed above, considered collectively, demonstrate that Defendants knew or recklessly disregarded that they were misrepresenting the impact that its Newsfeed would have on its revenue growth, and that the Company was losing market share to its competitors with more favorable pricing and engagement models.

69. Indeed, Defendants Tangney and Bryson were the executives most principally charged with ensuring that the Company was providing investors with an accurate representation of the current state of affairs of Doximity's business, including any financial guidance that Doximity provided. In that regard, Defendants Tangney and Bryson had unfettered access to the Company's internal data—including an internal dashboard— and reports.

70. Further, when questioned by analysts about the Company's e-newsletter product, Defendant Tangney expressly denied the existence of such a product.

71. Collectively, these facts give rise to a strong inference of scienter.

## X. CLAIMS FOR RELIEF

### COUNT I

### For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5

### (Against All Defendants)

72. Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

73. During the Class Period, the Defendants carried out a plan, scheme, and course of conduct which intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (b) cause Plaintiff and other members of the Class to purchase Doximity common stock at artificially inflated prices.

74. The Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

75. The Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the U.S. mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

76. During the Class Period, the Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

77. The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or recklessly disregarded the true facts that were available to them. The Defendants engaged in this misconduct to conceal Doximity's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

78. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they purchased Doximity common stock at artificially inflated prices and were harmed when the truth about Doximity negatively impacted the price of the Company's common stock. Plaintiff and the Class would not have purchased Doximity common stock at the prices they paid, or at all, had they been aware that the market prices for Doximity common stock had been artificially inflated by the Defendants' fraudulent course of conduct.

79. As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

80. By virtue of the foregoing, the Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**COUNT II**

**For Violations of Section 20(a) of the Exchange Act**

**(Against the Individual Defendants)**

81. Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

82. The Individual Defendants acted as controlling persons of Doximity within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, participation in and awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and intimate knowledge of the Company's actual performance, and their power to control public statements about Doximity, the Individual Defendants had the power and ability to control the actions of Doximity and its employees. By reason of this conduct, the Individual Defendants are liable under Section 20(a) of the Exchange Act.

## XI. PRAYER FOR RELIEF

83. WHEREFORE, Plaintiff prays for judgment as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensation to Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d) Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XII. JURY DEMAND

84. Plaintiff demands a trial by jury.

DATED: September 16, 2026

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ Jonathan D. Uslaner*
JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3481

-and-

HANNAH ROSS
(hannah@blbglaw.com)
SCOTT R. FOGLIETTA
(scott.foglietta@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444

*Counsel for Plaintiff Michigan Laborers' Pension Fund*

**CERTIFICATION PURSUANT TO**
**THE FEDERAL SECURITIES LAWS**

The undersigned, Alex Zurek and Robert Coppersmith, on behalf of Michigan Laborers' Pension Fund ("Michigan Laborers"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. We are fully authorized to enter into and execute this Certification on behalf of Michigan Laborers. We have reviewed the complaint and authorize its filing.

2. Michigan Laborers did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Michigan Laborers is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Michigan Laborers' transactions in the Doximity, Inc. securities that are the subject of this action are set forth in the chart attached hereto.

5. Michigan Laborers has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

   *In re RxSight, Inc. Securities Litigation*, No. 25-cv-1596 (C.D. Cal.)

6. Michigan Laborers has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for appointment as lead plaintiff or was not appointed lead plaintiff:

   *Uziel v. Pinterest, Inc.*, No. 26-cv-2745 (N.D. Cal.)
   *Munch v. Sprout Social, Inc.*, No. 24-cv-3867 (N.D. Ill.)
   *In re Paycom Software, Inc. Securities Litigation*, No. 23-cv-1019 (W.D. Okla.)
   *In re UiPath, Inc. Securities Litigation*, No. 23-cv-7908 (S.D.N.Y.)

7. Michigan Laborers will not accept any payment for serving as a representative party on behalf of the class beyond Michigan Laborers' pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class, as ordered or approved by the Court.

We declare under penalty of perjury that the foregoing is true and correct. Executed this ___ day of September, 2026.

For Michigan Laborers' Pension Fund:

Alex Zurek, Chairman

Robert Coppersmith, Secretary

**Michigan Laborers' Pension Fund**
**Transactions in Doximity, Inc.**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 4/23/2025 | 670 | 54.7953 |
| Purchase | 4/23/2025 | 670 | 55.7285 |
| Purchase | 4/23/2025 | 670 | 54.5394 |
| Purchase | 7/11/2025 | 1,679 | 60.2519 |
| Sale | 3/31/2026 | (738) | 22.4644 |
| Sale | 3/31/2026 | (737) | 23.4293 |
| Sale | 3/31/2026 | (738) | 23.1896 |
| Sale | 3/31/2026 | (738) | 23.2702 |
| Sale | 3/31/2026 | (738) | 23.6042 |